Perez or Perez? I don't know how he pronounces it. I would say Perez. Thank you, Jane. Thank you so much. Ms. Hutchinson, you have reserved two minutes for rebuttal, but before you even start, tell us how your client pronounces it. It is Mr. Perez. Good morning. It is the court, Kendra Hutchinson, for counsel to stand for Dr. Perez. The Mandatory Victim Restitution Act requires a defendant to pay restitution only to those victims he directly or possibly harmed. Here, the government did not approve transparency of the evidence that Mr. Perez directly or possibly harmed the victims of his illegal defense trade. So what do you think is the government's burden here, that either Mr. Perez made unauthorized trades with Turney, or only that he was aware of Mr. Turney's unauthorized trades? I think the case is instructive. The government's burden here is to prove the direct or possibly which is the foreseeability. I think that's a lot of what's at issue in this case, Your Honor. Both the knowledge of what his co-defendant is doing, but also the extent of the harm that comes directly from this court's language in United States v. Goodrich, right? The extent of the harm is also a part of the government's burden, and that's why this court remanded it in Goodrich, actually. And so I think that is where the government's burden is here, and they haven't made it out. So is the argument that made one a factual regarding the scope of the involvement, or is it a legal error? And you can appreciate why that matters to me because of the standard of review perspective. Absolutely, Your Honor. I've been thinking very carefully about that, too. I think the court on this record could find legal error, and the reason I would point the court to is, you know, when the judge issues the restitution order, states, it finds that Perez and Turney are equally responsible to make good upon the losses of the clients of Global. Now, what the judge does not do there is reference the direct and proximate cause requirement, which is specifization. And I would note that in Goodrich, which, you know, a fairly recent case from this court, the court remanded in part for legal error, stating the district court applied an incorrect legal standard by omitting any analysis of whether the offense of commission, quote, directly and proximately caused losses. So I think the court could find legal error here. I also think the court could find legal error as to the apportionment issue, inasmuch as the defense asked the court to take into account Mr. Perez's financial circumstances, and as the statute requires it, but the court did not mention that in imposing on him several higher rates. I do think the court would find legal error. I also think, Your Honor, that there are a lot of counsel clients that are fairly romantic, speaking to, sort of earlier, Your Honor, brought up here. Now, the court engaged in a very extensive factual analysis as to the guidelines and loss issue, and I understand that this court can look to that in, you know, the restitution determination. And the court, the district court stated, you know, found that they worked together, that they had their systems working together, each supplementing the other, in trying to achieve Mr. Engler's goal of creating more commissions for global. And, quote, that Mr. Perez had full knowledge of this. I contend that there is not evidence, not record evidence, that Mr. Perez supplemented Mr. Cherney's co-defendant's traits. Here, what we have is an agreement, a plea agreement, that did not have an amount, a loss amount stipulated. We have an application in which he did not allocate an amount of a plea, and this was in September 2020, which is a very, very long time ago. The indictment, you know, lists a number that's bigger than what you're arguing, right? Well, yeah, actually, Judge, the indictment lists... Well, $2.44 million in commissions and fees for global is one of the things in the indictment, the information. That's right. You're on the superscreen information. It lists a value of $160 million for traits and $2.4 million in commissions, but that's not victim loss. And actually, at the time of the plea, the government did not have, you know, did not state what that loss was. It stated it ranged between $1.5 to, I think, $4.5 or $5.5 is what they stated at the time. So this case is very unlike the United States v. Smith, you know, a summary order out of this court where the court applied the principles, you know, that I and my friend here agree with. You know, we agree with what law is applicable here, and in the United States v. Smith, the court affirmed, or restitution orders, the defendant's being, you know, exactly the same argument as attorney, but, you know, one of the main reasons was that the defendant there stipulated in the plea agreement to a full loss amount. That didn't happen here. And there was, you know, record evidence that she was aware of everything that her, you know, her co-defendant was doing. So, you know, there's nothing in the charge of this, in the huge range of things that, you know, Judge Baldwin brought up. You know, certainly there are overt acts called action. We don't dispute those, but those overt acts show Mr. Turney engaging in, you know, Mr. Egbert, the real big cheese here, engaging and pressuring Mr. Perez to do things, but not, you know, there's no evidence that Mr. Perez, you know, sort of, this goes upstream, right? This little fish, you know, is sort of helping upstream. Right, but I mean, the argument, I don't think little fish. I mean, there's three people, really, right? And they all know what they're doing. I mean, certainly Turney and your client know that this is the directive from above, and this is what they're supposed to do, right? And, Your Honor, we're not, you know, I don't think we can argue here that Mr. Perez acknowledged that Mr. Turney was executing the trades. I think that's part of the fabric here. But you're saying he has to know, sort of, each trade to be responsible for it? No. Or even more than that? But he does need to know the extent, Your Honor, and the extent is not obvious from the record that this Court consults in these considerations, which is the plea agreement, the allocution, and the charge against Turney. It is not evident at the time of this plea, you know, the government did not indeed even represent what the loss amount was. That is not evident in the community extent of what Mr. Turney was doing. But wait, so if you and I have an agreement that we're going to defraud, sort of, a group of people, and our task is, okay, defraud as many as you can, and we'll settle up later. If it turns out that you do twice as many as me, and then I'm not responsible for that? I think it really depends on what, sort of, happens around the plea, Your Honor. This is not like a trial, for example. I think a trial would obviously, sort of, prove some, you know, the force, the ability, and the extent of knowledge right on reasonable doubt. So that's why you think you're not in the same position as what happened in Boyd? Because this one was a plea agreement, and Boyd was a trial? I'm sorry, I didn't mean to fall back into Judge Sullivan's question. I think this is not really, because at this point, you know, found in that case, the jury necessarily made the force, the ability determination in holding the defendant guilty, you know, on a reader's reliability. Here, the force, the ability determination does not work with respect to those who believe that the claimant did. You know, he contested it from the beginning. He also even contested it as to the guideline's loss amount, you know, and that is what is different here, and the judge was required to really parse out, you know, this court has been careful in the cases that we cite, that both Byron and I cite, you know, Quidrich, Boyd, you know, Vanquish, even the summary court that I just brought up, and this court has been really careful to go to the record of conviction and really, sort of, parse out, did the judge, you know, make this force, the ability determination? And we can tell that there's, you know, this record isn't enough. Now, we think that this, you know, strike the co-defendant's liability, you know, in entering order only, you know, apportioning him to Mr. Perez. You know, if the court concludes otherwise or, you know, has some doubts, you know, the court could also take the action that it took in the United States versus Vanquish and make sure there's a Jacobson recount. You know, that's possible, too. Obviously, we don't think the court needs to, but, you know, that's here. And I just very, very quickly, you know, I'm over my time. I have, like, five seconds for the apportionment, if the court would allow me. Sure. Thank you very much, Your Honor. You know, I understand that the apportionment standard is even more difficult than what I've been discussing. This is an abuse of discretion. This is a real discretionary standard. Counsel argued it below, argued to address it here. You know, on a record like this, where a defendant provided such substantial cooperation from the very beginning, it is manifestly unfair that it was apportioned in the way it was. He's on the hook for Mr. Turney's actions here. So we really ask the court to look at that. Thank you very much. Thank you. You have reserved a few minutes for rebuttal. We'll hear from Ms. Jones. Good morning. May it please the Court, Shannon Jones of the United States. I work for the attorney who represented the government in the proceeding. I'm so sorry. I'm having a hard time hearing you. Can you move your mic closer to me? So Hector Perez, pleaded guilty, pursuant to a cooperation agreement, is conspiring to command securities fraud. The charged conspiracy, the offense of conviction, as described in the information, involved over 4,500 unauthorized trades in more than 350 customer's accounts handled by Perez and his co-conspirator, Josh Turney, over a two-month period of time and caused approximately $5.3 million in law-enforcing victims. Before he pled guilty, Perez met with the government on multiple occasions to discuss what he knew about the unauthorized trading, and agreed to go back to Credit Global in a successful effort to cooperate. Can you explain to me, like, I just want to take a step back. Why is this joint and several liability so important to the government in this case? Are you not going to be able to recover from Mr. Turney? Well, joint and. It's important in the case because the Illinois Victims of Restitution Act requires that all victims be included as part of the restitution order. The court may have the discretion to apportion it if it chooses to do so, but all of these victims were victims of the offense of conviction, which was the securities fraud charge laid out on the conspiracy. Whether or not money was collected from either of these individuals is unknown. I mean, Mr. Turney was sentenced to two years in prison. I think he may be already out, but he committed two of them. Both of them had been barred from securities industry. Both of them have to, like, come up with a career to move forward. Neither of them has sufficient assets, and I don't think either of them has even satisfied the court's requirements. Thank you. What do you think is the best evidence in the record indicating foreseeability? Because your colleague on the other side is not disputing the requirement of void. You're just saying that it wasn't met in this case. So, what do you think is the best stuff that we have? Well, at this sentencing, there were no factual disputes. And in fact, the district court specifically pressed Mr. President's attorney and said, are you asking for a factual? Are there any factual disputes here? Are you accepting as true the government's offer of proof that the government represents them in its letters? And I agree that Mr. Perez and Mr. Turney were working together to achieve the goals of global donors. But that's not the same thing as foreseeability, though. I understand. So, in those sentencing submissions and the representations that were made in court, it was undisputed that Mr. Perez knew that Mr. Turney was engaged in an authorized trade. It was undisputed that he discussed an authorized trade and how to go about doing an authorized trade. And the record also showed that Mr. Engler was pushing Mr. Perez to basically turn over all of his client accounts on a daily basis to sort of maximize as much commissions as he could. And the two months before global went out of business. He understood that Mr. Turney had the exact same goals, the same instructions, and was a more senior, more successful broker with more clients who were making more money at So, you just conceded that he may not have known how many trades. Why is that not fatal? Because it's just because you don't have actual knowledge doesn't mean it's not reasonably foreseeable to you. So, the fact that I think it was absolutely reasonably foreseeable to him that Josh Turney was turning all his customers' accounts, just like Mr. Perez was, and that he was trying to maximize commissions just like Mr. Perez was, and because Mr. Turney had a bigger global business with more customers and more accounts, which Mr. Perez knew. Do you think Mr. Perez knew the amount, like how much bigger and how many customers? I think he would know proportionally, like this guy has more than double my amount of global business. I'm sure he knew that. And whether or not Mr. Turney, Mr. Perez probably how much damage he was causing to his own customers. And he would probably take trade tickets, you know, daily, you know, cut him hundreds of tickets. Right, but doesn't that cut against you that he didn't know what his own damages was? Like what damage he was causing? I'm not sure how that helps the government. He knew exactly how many of those trades he was doing because he was doing those trades. What investment losses that caused was defined in terms of how much money they would lose through paying all these commissions plus the investment losses. But he's on the hook for money though, right? So if he didn't actually know how much investment losses these were causing, and he didn't know how much that was, how does that not speak to foreseeability? Because you don't need to know the exact amount of loss. What you need to know is I am committing this crime, this crime is I have victims, these victims are going to be harmed, and at the end of the day, when the calculation is done, the defendant is also to the victims for the amount of loss caused by this conviction. I wanted to make sure I didn't say much about United States Goodrich. There was another case which I handled before additional court ends on the appeal. And in that case, Which case? I didn't hear what you said. United States versus Goodrich. Goodrich, oh yeah, okay. So in Goodrich, the circumstances concluded that the offense of conviction was much narrower than what the government had argued. And they found that the offense of conviction did not cause the restitution damages that they ultimately ended up showing or not. So in Goodrich, Goodrich's law was appropriate. He was involved in a market manipulation scheme involving the stock market. He's found guilty to engaging in illegal trade, including nationalized trades, trades of stock exporters, in the over-the-counter market and unrestricted huge stock. Those trade, victims who buy unrestricted huge stock, not just the victims who buy from Goodrich directly, but all the victims who buy in the open market during the period of time where he was involved in a conspiracy, filled with the restitution losses that the District Court and the Court of Appeals affirmed were appropriate. That was $410,000. There was also $1.8 million in private placement losses, where investors who bought huge stock in a private placement that was restricted during the same time period at a much lower price. The government had argued that those victims were also part of the conspiracy that distributed huge stock, and they should be considered victims. On appeal, the Second Circuit said, defense of conviction only covers the over-the-counter unrestricted stock. The defense of conviction does not include the private placement. It was not mentioned in the indictment, and it was not mentioned in the plea agreement. This is very different, because here the defense of conviction is explicit that it covers all 450 trades. 4,500 trades. How many trades? 4,500. Yeah. So we'll report that 4,500. The defense of conviction here clearly covers all the victim losses. In Goodrich, the defense of conviction did not cover the victim losses that were reversed. And then the court went a step further and said, well, even though the defense of conviction was committed by the total conspirators and, I guess, separate conspirators who recently forced sequels of Goodrich, the court of appeals said, no, there's not enough evidence in the record to show by performance of the evidence that Goodrich even knew about the private placement losses. And it's very different here, because here it's both the defense of conviction who has had actual knowledge that an attorney was engaged in these unauthorized trades, and he should be on the hook for the entire amount of the loss. And the very text of the cooperation agreement supports your position, right? Well, Andrew, can I go back to the speech that the department was supposed to have? It was not. We would have had a hearing on the district court. Mr. Perez would have been required to be on the stand for the requirements of the corporate agreement and describe to And what is the relevant text of the agreement, in your view? What does it say? The cooperation agreement. The cooperation agreement. The cooperation agreement requires that if requested to do so by the government, he has to testify as requested, and he has to testify truthfully. So he would have had to testify at the testimony, but the parties did not believe that there was a fact of dispute that required his testimony to pick that up. And I would agree with the question that it was entirely within the district court's position to decide that a corporate agreement was not appropriate here. It's a business requirement, it's not mandatory, and required the president to pay the full amount of the restitution. This court has a widely-legitimized and non-existing statute. All right. Thank you very much, Ms. Jones. We'll hear from Ms. Hutchinson for two minutes of rebuttal. Thank you, Governor, very much. I just want to quickly note, you know, the government has sort of talked, you know, about whether or not the defendants in this case are actually meeting the restitution obligations. I just want to let you know that Mr. Press is currently on sort of unlimited needs. He's still a real estate broker, beloved in New Jersey, and he's making his restitution payments, and so he wants to, as he stated on the record of the sentence. Right, but I mean, I think the point is that he's not close to reaching the restitution, even the amount you're arguing for, right? That's right, Governor. That's absolutely right. But, you know, he's got to have a No, but the point is it might really matter to victims whether or not we take one approach or the other with respect to the restitution awards. It's not like each man has got, you know, millions of dollars in a bank account someplace, and we can get recovery one way or another. That's right, but it is not academic in this case, Your Honor, because I think $1.1 million is a lot more doable than 535, especially for someone who, you know, works in real estate, and that's actually possible at some point in someone's life. Yeah, but the point of the Mandatory Victims Restitution Act is to get restitution to victims. It's not to sort of make it easier on the people who have the restitution obligations. You're absolutely right, Your Honor, and that's where the apportionment statute takes into account, you know, 36-64, right? The economic circumstances of each individual defendant, and that's one of the reasons why we intend to apportion this differently. You know, as to this idea of a factual hearing or a factual hearing, you know, it's absolutely right that the defense and the defense or the government disputed the amounts that the SEC, you know, figured as to loss, as to the victims' loss, but they both agreed that they disputed the legal conclusions here. The legal conclusions of foreseeability? That's right, Your Honor, yep, and that's what the whole, you know, charge of loss was. And, you know, the government makes a lot of, you know, assertions about disinvolvement and knowledge of investment losses and et cetera, and I just, you know, this, those assertions could have been placed in the plea agreement, but they were not. They could have been placed in the charge sheet and submitted totally, you know, put in a word box as an outcome, again, sort of upstream, like assistance, but they should have talked to them and this was their obligation that this was augmented to the evidence. And I just, I guess I want to close with a quote from this court in the United States v. DR, which is a case we have in discussion that isn't in both our briefings. The MVRA's definition of victims reflects an important limiting principle for restitution awards, namely that Congress has authorized the award of restitution only for the loss caused by the specific conduct that was the basis of the office of the commission. This is a backstop. The MVRA's definition of victim is different from the guidelines the NASA force was playing here. Thank you. All right. I mean, Villar, I mean, is probably more like this case than anything else. Those were two defendants. One of them did all the client-facing work, and one of them did basically the investing decision work, and yet they were each liable for restitution, right? But not on this record, Your Honor. This record is not on this case. Thank you. All right. Thank you, Ms. Hutchinson. Thank you both. We will reserve decision.